# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ANGELINA JOHNSON | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. N25A-05-005 KMM |
| CHRISTIANA SCHOOL DISTRICT, | ) | |
| | ) | |
| Appellee. | ) | |

Submitted: April 20, 2026
Decided: July 16, 2026

*Upon appeal of Industrial Accident Board Decision – Affirmed*

## <u>MEMORANDUM OPINION</u>

Cynthia Pruitt, Esquire., DOROSHOW PASQUALE KRAWITZ & BHAYA, Wilmington, Delaware, *Attorney for Appellant*.

William R. Baker, Esquire., TYBOUT REDFEARN & PELL, Wilmington, Delaware, *Attorney for Appellee*.

**Miller, J.**

# I.     *Introduction*

Claimant Angela Johnson ("Johnson") was employed by Christiana School District ("Employer") as a third-grade teacher when she suffered a spinal stroke while at school on January 6, 2022, which left her a paraplegic. Johnson filed a Petition to Determine Compensation Due with the Industrial Accident Board (the "Board"). The Board held an evidentiary hearing (the "Hearing") on Johnson's petition, during which it heard testimony from Johnson, Employer, and two competing medical experts. The central issue was causation.

The Board issued its April 24, 2025 decision (the "Decision") denying Johnson's petition. Because there was no identifiable industrial accident, the Board applied the *Duvall v. Charles Connell Roofing* "substantial cause" standard. The Board accepted Employer's expert's opinions over the opinions offered by Johnson's expert and ruled that Johnson's job-related stress was not a substantial cause of the stroke.

Johnson filed an appeal making two arguments. First, an identifiable industrial accident occurred and therefore, the Board erred by applying an incorrect legal standard. Instead of the "substantial cause" standard in *Duvall*, the Board should have applied the "but for" standard expressed in *Reese v. Home Budget.* Second, accepting Employer's medical expert's opinions on causation was not supported by substantial evidence in the record.

Employer counters that the Board applied the correct legal standard because there was no identifiable accident and, further substantial evidence supports the Board's decision to accept Employer's expert's opinions over Johnson's expert.

There is no evidence in the record that Johnson suffered an identifiable industrial accident. Therefore, the Board did not err in applying the *Duvall* standard. Further, the Board's findings are supported by substantial evidence. Accordingly, the Decision is AFFIRMED.

## II.      *Factual Background*

### A.     *Johnson's Evaluation*

After years as a paraprofessional,[1] Johnson obtained a teaching certificate from Wilmington University.[2] In 2020, she was hired by Employer as a Special Education teacher at Bancroft Elementary School.[3] In 2021, Johnson was elevated to a Team Leader for the third-grade teachers.[4] Employer conducts teacher performance evaluations twice a year: one is an advanced-scheduled classroom observation and the other is an unannounced classroom observation, for which the teacher is provided 24-hours' notice.[5] An evaluation will result in either an

---

[1] Industrial Accident Board Hearing February 24, 2025 transcript ("Hearing Tr."), at 8-9.
[2] *Id.* at 14-15.
[3] *Id.* at 15.
[4] *Id.* at 17.
[5] *Id.* at 17, 46-47; *see also* Johnson Ex. 2 (previous performance reviews). Although the testimony is unclear exactly how much notice is given for the announced observation compared to the

"effective" or "ineffective" rating.[6] An "ineffective" rating over multiple evaluations will result in the teacher being placed on an improvement plan.[7] If the teacher fails to improve, the teacher could then be "written up" and eventually fired.[8] The improvement plan is "a three-year process."[9]

On January 5, 2022, Johnson was informed that principal Rella Reynolds ("Reynolds") would perform a classroom evaluation the next day.[10] Reynolds conducted Johnson's previous evaluations.[11] Johnson was nervous because Reynolds "was very hard and very critical of [Johnson] and [her] work in [the] classroom"[12] and never gave her a really good evaluation,[13] despite Johnson believing she deserved a higher rating.[14] As a result, the evaluations with Reynolds were "very strenuous" for Johnson.[15] Johnson worried that if she received multiple

---

unannounced observation, Johnson explained in her brief that "one [is] announced ahead of time, and one announced the day before." Johnson's Opening Brief ("OB"), at 4 (D.I. 19).

[6] Hearing Tr., at 73.

[7] *Id.* at 74.

[8] *Id.* at 38-39.

[9] *Id.* at 74.

[10] *Id.* at 22-23, 37.

[11] *Id.* at 21; *see also* Johnson Ex. 2.

[12] Hearing Tr., at 21. Johnson believed Reynolds wanted to fire her. *See id.* at 21-22, 37, 41, 49.

[13] *Id.* at 22.

[14] *Id.* at 37 ("My work is exemplary"). While the evaluator's only options were to rate a teacher "effective" or "ineffective" (*Id.* at 73), Johnson testified she was "not used to getting [an] effective" rating because her "work is exemplary" and she's "better than effective." *Id.* at 37. It appears that Johnson may have been referring to the ratings she received as a paraprofessional, which used a different scale. Hearing Tr., at 10-13, 38; *see also* Johnson Ex. 2.

[15] Hearing Tr., at 21. Johnson was "intimidated by" Reynolds, who Johnson felt was not "supportive." *Id.* at 22, 41.

bad evaluations from Reynolds, Johnson would get "blackballed" among the other principals.[16]

Johnson never received an "ineffective" rating. Indeed, in her last evaluation, Johnson received an "effective" rating in every category.[17] And Reynolds included the comment that "Ms. Johnson has shown consistent effective performance throughout the formative cycle."[18] Accordingly, Johnson was not on probation or an improvement plan at the time of her injury.[19] Thus, as of January 5, 2022, Johnson was not in danger of losing her job.[20]

### B.  *Johnson suffers a stroke*.

Johnson worked late on January 5 to ensure she was ready for the evaluation the next day.[21] That evening, Johnson attended a Boy Scout meeting where she had trouble focusing because she was dwelling on the upcoming review.[22] While at the meeting, Johnson began experiencing back spasms, for which she took an over-the-counter pain medication.[23] The following morning, Johnson's "leg felt a little funny," she "felt nauseated," and her "hands started hurting and just shaking."[24]

---

[16] *Id.*. at 22.
[17] *Id.* at 20-21, 37.
[18] *Id.* at 37; Johnson Ex. 2, at 36.
[19] Hearing Tr., at 36, 39-40.
[20] *Id.* at 75.
[21] *Id.* at 23.
[22] *Id.* at 24.
[23] *Id.*
[24] *Id.*

Because she had a headache, she checked her blood pressure, which was 187/95.[25] Johnson then proceeded to school.

At school, in preparation for the evaluation, Johnson was making copies in the lounge when she suddenly could not feel her legs, they "just went out" from under her, and she collapsed.[26] Johnson experienced "excruciating pain" in her back, hips, legs, and feet.[27] She could not move. Johnson was transported to Christiana Care by ambulance.[28] The hospital records indicate that Johnson reported to the neurologist that she was not feeling stressed.[29]

Johnson was diagnosed with having suffered a spinal stroke, which left her a paraplegic.[30] The blockage, or occlusion, occurred where the artery enters the spine between T12 and T9.[31]

## C.    *Johnson's pre-existing medical conditions*

Johnson has a history of high blood pressure (hypertension),[32] high blood sugar,[33] and anxiety.[34] As to the hypertension, Johnson admitted that multiple times

---

[25] *Id.*
[26] *Id.* at 25.
[27] *Id.*
[28] *Id.* at 26.
[29] *Id.* at 28.
[30] Johnson Ex. 3, January 23, 2025 deposition transcript of Michael Dogali, M.D. ("Dogali Tr."), at 24; Employer Ex. 1, February 20, 2025 deposition transcript of John B. Townsend, III, M.D. ("Townsend Tr."), at 39.
[31] Dogali Tr., at 21-22.
[32] Hearing Tr., at 24, 29.
[33] *Id.* at 30-31.
[34] *Id.* at 31-33.

over the two years prior to the injury, her blood pressure readings were considered critically high.[35] Johnson's medical records indicated, and she agreed, that there would be periods when she did not take blood pressure medications, despite having a prescription.[36] As to her high blood sugar, Johnson recalled having A1C and blood sugar levels over the recommended levels for years prior to the injury.[37] Johnson testified that she had taken Lexapro, Xanax, and Prozac over the years for anxiety.[38]

## D. *The Medical Experts*

### 1. *Dr. Dogali*

Johnson offered the expert testimony of Michael Dogali, M.D., a Florida neurosurgeon.[39] Dr. Dogali has treated hundreds of stroke patients and researched the relationship between stress and strokes, developing a special interest in hemorrhagic strokes.[40] Dr. Dogali did not examine Johnson but conducted an interview with her.[41] Dr. Dogali noted Johnson's severe diabetes, hypertension, high cholesterol, hyperlipidemia, anxiety, and migraine headaches.[42] Dr. Dogali did not

---

[35] *Id.* at 29. As recently as four months prior to the injury, medical records indicate that Johnson's blood pressured reached readings of 157/103 and 161/111. Townsend Tr., at 32-33.

[36] Hearing Tr., at 29.

[37] *Id.* at 31. As recently as four months prior to the injury, medical records indicate that Johnson's A1C levels reached 9.8. Townsend Tr., at 33. Her highest recorded levels reached 11.9. Townsend Tr., at 54.

[38] Hearing Tr., at 31.

[39] Dogali Tr., at 4-5.

[40] *Id.* at 6.

[41] *Id.* at 13. Because Johnson was two years post-stroke and prior medical records, which included the results of an American Spinal Cord Injury Association exam, were available, Dr. Dogali testified that a physician exam was not necessary. *Id.* at 13-14.

[42] *Id.* at 14.

review Johnson's past blood pressure readings[43] or take a family history.[44] He was unaware of whether Johnson was taking her blood pressure medication in the days leading up to the incident.[45] Dr. Dogali's record-review was limited to the Christiana Care records from 2022 onward.[46]

During the interview, Johnson recounted the onset of her symptoms and reported great stress stemming from the upcoming evaluation,[47] believing she may be fired.[48]

Dr. Dogali explained that with heightened stress, essentially in "fight or flight" reaction,[49] the body's immunological system becomes very active, releasing adrenaline and norepinephrine, which raises blood pressure very quickly.[50] He testified that studies have shown approximately 30-40% of cerebral stroke victims experienced a severe anxiety attack within an hour preceding the event.[51] Similar results are found in cardiac patients.[52] Dr. Dogali recognized that while this

---

[43] *Id.* at 49-50.
[44] *Id.* at 42-43.
[45] *Id.* at 52.
[46] *Id.* at 38-40.
[47] *Id.* at 16.
[48] *Id.* at 16, 19-20.
[49] *Id.* at 17.
[50] *Id.* at 17-18.
[51] *Id.* at 6-7, 18-19.
[52] *Id.* at 18.

correlation "hasn't been as widely accepted for stroke[s], … it is becoming now recognized both in the literature and in practice."[53]

In Dr. Dogali's view, the back pain and spasms Johnson suffered the night before was a "prodromal event."[54]   He opined that Johnson actually suffered two strokes the morning of January 6: an initial vascular infarction followed by a hemorrhagic infarction.[55]  While making copies, Johnson experienced a blockage of the artery, which cutoff the blood flow, causing the spinal cord to stop functioning and the cells begin to die, and eventually the hemorrhagic stroke occurred when the blood vessel burst.[56]  Dr. Dogali opined that Johnson's stress associated with the upcoming evaluation "contributed to" the spinal strokes.[57]

Dr. Dogali acknowledged Johnson's emergency room statement that she was not stressed and Johnson's denial that she would ever make such a statement because she was highly stressed leading up to the incident.[58]  Dr. Dogali explained that this discrepancy was likely due to the pain medications she was given that day, including morphine.[59]

---

[53] *Id.* at 6-7.
[54] A prodromal event is an early sign or a precursor.
[55] Dogali Tr., at 23-24.
[56] *Id.* at 21-24.
[57] *Id.* at 27, 36.  Dr. Dogali also referred to Johnson's stress as a trigger. *Id.* at 36.
[58] Hearing Tr., at 28-29.
[59] Dogali Tr., at 47.

Dr. Dogali also acknowledged Johnson's numerous pre-existing health conditions and that she was obese,[60] all of which are risk factors for a stroke.[61] He believed that her high blood pressure and diabetes "would have caused [a stroke or heart attack]" in the future.[62]

### 2. *Dr. Townsend*

John Townsend III, M.D., a board-certified neurologist, testified for Employer.[63] Dr. Townsend treated stroke patients in the emergency room for approximately 20 years, early in his career.[64] Most strokes are cerebral, with spinal strokes accounting for only 1% of all strokes.[65] He testified that there are two types of spinal strokes: (1) ischemic strokes, where a blood clot blocks a blood vessel in the spinal cord; and (2) hemorrhagic strokes, which occur when the spinal cord breaks or tears.[66] The majority of spinal strokes are ischemic.[67] Dr. Townsend testified that the "biggest of the risk factors" for spinal strokes is atherosclerosis vascular disease (a buildup of plaque in an artery).[68] Other high risk factors include

---

[60] *Id.* at 43.
[61] *Id.* at 41.
[62] *Id.* at 36.
[63] Townsend Tr., at 4.
[64] In 2008, hospitals hired in-house stroke neurologists, so emergency doctors no longer provided initial treatment for stroke patients. *Id.* at 6.
[65] *Id.* at 5.
[66] *Id.* at 9.
[67] *Id.*
[68] *Id.* at 11-12, 14-15.

"high cholesterol, hypertension, [and] diabetes."[69]  He further testified that the cerebral stroke literature supports a finding that patients with variable blood pressure are at six-times a greater risk of an ischemic event compared to those who had well controlled blood pressure.[70]

Dr. Townsend performed a physical and neurological exam of Johnson,[71] and reviewed medical records from Christiana Care, primary care providers and other medical providers, dating back to 2013.[72]  The records revealed that Johnson suffered from chronic anxiety,[73] "poorly controlled diabetes,"[74] "poorly controlled hypertension,"[75] high cholesterol, and weight issues.[76]  At times, she was noncompliant with the blood pressure medication recommendation[77] and monitoring her blood sugar levels.[78]  Additionally, Johnson suffered from diabetic retinopathy and hypertensive retinopathy, conditions caused by prolonged exposure to diabetes and high blood pressure, respectively.[79]

---

[69] *Id.* at 11-12.  Dr. Townsend also recognized obesity to be a high-risk factor of strokes in general, not spinal strokes specifically. *Id.* at 14.

[70] *Id.* at 16-17, 53.

[71] *Id.* at 37.

[72] *Id.* at 7. Dr. Townsend reviewed the records of Dr. Biasotto, MedExpress, Christiana Care, Crozer-Chester Medical Center, Brandywine Urology, Global Neuroscience Institute, Mid Atlantic Retina, Jefferson, Moss-Magee Rehab Hospital, Crestview Medical Center, Saint Francis Family Practice. *Id.* at 7.

[73] *Id.* at 22.

[74] *Id.* at 39.

[75] *Id.*

[76] *Id.* at 45.

[77] *Id.* at 23-24, 27-28, 53-54.

[78] *Id.* at 24, 26-27, 53-54.

[79] *Id.* at 29-30.

Dating back to 2014,[80] the records reflected Johnson's blood pressure was not controlled: in a 2020 visit, her blood pressure was 170/100, which was so high that Dr. Townsend would "be thinking about sending that person to the emergency room for acute treatment."[81] In the months leading up to the January 6 event, Johnson's readings were 157/103 and 161/111, again, very high.[82] Similarly, her diabetes was not under control two months prior to the incident, as she had an A1C reading of 9.8.[83]

Dr. Townsend opined Johnson suffered an ischemic spinal stroke followed by a hemorrhagic transformation.[84] While he agreed with Dr. Dogali that the "onset of the stroke" likely presented itself as the back pain the previous night,[85] Dr. Townsend disagreed with Dr. Dogali's opinion that Johnson experienced a hemorrhagic infarction and that she suffered two strokes.[86] Rather, Dr. Townsend opined that Johnson experienced a hemorrhagic transformation, where there is some leakage of the blood vessels due to damage to the brain barrier,[87] which is a "common consequence of [an] ischemic stroke."[88] He further opined that Johnson's spinal

---

[80] *Id.* at 23.
[81] *Id.* at 52.
[82] *Id.* at 32-33.
[83] *Id.* at 33. Johnson's A1C levels reached as high as 11.5 and 11.9. *Id.* at 54. A reading of 6 is recognized as the onset of diabetes. *Id.* at 27.
[84] *Id.* at 11, 36, 39, 59.
[85] *Id.* at 40-41.
[86] *Id.* at 42-43, 56-57.
[87] *Id.*. at 43.
[88] *Id.*

stroke "was more likely related to her history of hypertension and likely atherosclerosis as that has an increased risk with diabetes."[89] Dr. Townsend reached his conclusions based on Johnson's numerous chronic comorbidities for a stroke (including "high cholesterol, hypertension, hyperlipidemia," obesity, varied blood pressure, and high A1C levels)[90] and that Johnson's stress was unlikely to cause such a reaction that could produce the type of blood pressure increase suggested by Dr. Dogali.[91]

Dr. Townsend explained that no literature directly links stress to spinal strokes[92] and that none of the reports Dr. Dogali relied upon dealt with spinal strokes.[93] For example, one report "outline[d] or compare[d] the characteristics of cerebral" strokes to those of spinal strokes[94] and found that conditions such as heart disease, high blood pressure, and diabetes are similarly high-risk factors for each of the types of stroke, but it made no mention of stress being a causal contributor.[95] Additionally, according to the cerebral stroke articles, stress was considered only a

---

[89] Townsend Tr., at 40, 41-42. Dr. Townsend believed she was at risk of having a stroke prior to the spinal stroke on January 6, 2022. *Id.* at 72.
[90] *Id.* at 45.
[91] *Id.* at 75.
[92] *Id.* at 10, 47-48, 78.
[93] *Id.* at 12-13.
[94] *Id.* at 11.
[95] *Id.* at 11-12, 78-79. Dr. Townsend also noted that while "some of the risk factors are similar" for spinal strokes and cerebral strokes, "some of them are different." *Id.* at 78-79.

"moderate risk factor"[96] that increased the risk of a stroke by only 1.3 times.[97] Further, Dr. Townsend was unaware of any literature supporting Dr. Dogali's conclusion that 30-40% of strokes are preceded by an acute stress incident.[98]

### E.    *The Decision*

The Decision reflects a factual predicate leading up the incident on January 6, 2022 that is consistent with Johnson's version of events.  To those facts, the Board applied the *Duvall* standard to determine whether her injuries were compensable, which Johnson bore the burden of proving.[99]

"The Board accept[ed] the opinions of Dr. Townsend over the opinions of Dr. Dogali"[100] on two grounds.  First, Dr. Dogali's opinions were not supported by the literature.  He relied on two articles discussing the connection between stress and cerebral strokes, but neither addressed spinal strokes.[101]  Further, the articles characterized stress as a moderate risk factor (not high-risk),[102] and as Dr. Dogali acknowledged, the acute anxiety correlating to a stroke theory  is not widely

---

[96] *Id.* at 13-14.
[97] *Id.* at 14.
[98] *Id.* at 46.
[99] *Angelina Johnson v. Christiana School District*, IAB Hearing No. 142375, 27 (Apr. 24, 2025) (Decision) at 23.
[100] *Id.*
[101] *Id.*
[102] *Id.*

accepted for strokes but is becoming now recognized "for cerebral strokes both in the literature and in the practice."[103]

In contrast, Dr. Townsend relied on articles addressing spinal strokes and he testified that there was no literature linking stress to spinal strokes.[104]

Second, Dr. Dogali did not have a sufficient understanding of Johnson's medical history. He did not physically examine Johnson, he was not aware of the extent of her history of high blood pressure, how long she had a high BMI, whether she took medication for her anxiety, and had not reviewed any medical records prior to January 6, 2022.[105] Contrary to the medical records, the Board found that Dr. Dogali presumed Johnson had "relatively normal blood pressure" but started showing signs of hypertension only more recently.[106]

Johnson had a long history of health issues. The Board made factual findings that Johnson had a history of uncontrolled blood pressure for six or seven years and uncontrolled diabetes since 2014.[107] She had not taken blood pressure medication in the three weeks leading up to the January 6 incident.[108] Johnson also suffered from a history of uncontrolled anxiety and stress, both at home and at work.[109]

---

[103] *Id.* at 8.
[104] *Id.* at 24.
[105] *Id.* at 8, 11.
[106] *Id.* at 11.
[107] *Id.* at 14-16.
[108] *Id.* at 14.
[109] *Id.* at 15.

Ultimately, the Board found that "Dr. Townsend presented more credibly than Dr. Dogali" and it accepted Dr. Townsend's opinion that Johnson suffered one stroke followed by a transformation.[110] "Considering the number and extent of [Johnson's] comorbidities that ha[d] been recognized as risk factors, the Board f[ound] that [Johnson's] spinal stroke had been in the process and occurred unrelated to work."[111]

The Board recognized that Johnson was "highly stressed because of her upcoming performance evaluation" and this stress was heightened by her poor relationship with the evaluator.[112] Johnson had "not previously received a poor performance evaluation," "she was not on probation," nor "she was … under an improvement plan."[113] And had she received a poor performance evaluation on January 6, she would not be immediately fired[114] because the administrative process would have taken at least a few years.[115] Thus, the objective evidence did not suggest that Johnson was at risk of losing her job. Yet, she was quite anxious about the review.

The Board did not attempt to quantify the impact of Johnson's stress, stating "[n]o one but [Johnson] knows how stressed [she] was about the performance

---

[110] *Id.* at 25.
[111] *Id.*
[112] *Id.*
[113] Decision, at 25.
[114] *Id.* at 25-26.
[115] *Id.* at 26.

15

evaluation compared to her other stressors."[116]  But while Johnson "might believe she suffered a spinal stroke because of her heightened stress related to her performance evaluation[,] the medical evidence did not support her belief."[117] Because that belief was not "[]supported by the medical evidence," the Board found no evidence that stress "is a contributing factor to a spinal stroke."[118]  Accordingly, Johnson did not sustain her burden of proof and the Board found her injury was not compensable.

### III.    *The Parties' Contentions*

Johnson raises two issues on appeal: (1) the Board erred in applying the *Duvall v. Charles Connell Roofing* standard as opposed to the standard expressed in *Reese v. Home Budget* because there was an identifiable industrial accident; and (2) the Board's decision to accept Dr. Townsend's medical opinion was not supported by substantial evidence.

On the first ground, Johnson argues that the annual evaluation is an identifiable event, which caused heightened anxiety, "trigger[ing]" a spinal stroke. As such, the Board should have applied the *Reese* standard and examined whether the heightened stress was "a cause" rather than "a substantial cause" of the stroke.

---

[116] *Id.*
[117] *Id.*
[118] *Id.*

16

On the second ground, Johnson asserts that the Board's acceptance of Dr. Townsend's medical opinion over Dr. Dogali's is not supported by the substantial evidence because the Board found the following: (i) a spinal stroke is a rare condition; (ii) there are not many studies or much literature on spinal strokes; (iii) significantly heightened stress is a contributing factor for cerebral strokes; (iv) there is no evidence that significantly heightened stress is a contributing factor for spinal strokes; and (v) it will not make a finding that is unsupported by medical evidence. In essence, Johnson contends that because there was no medical evidence submitted showing a spinal stroke is different than a cerebral stroke, the Decision lacks substantial evidence.

Employer responds that the Board correctly applied the *Duvall* standard as there was no identifiable industrial accident. Further, the Board's conclusions regarding the cause of a spinal stroke are supported by substantial evidence in the record, as explained by Dr. Townsend.

## IV. *Standard of Review*

This court's review of the Decision is limited to an examination of the record for errors of law and a finding of whether substantial evidence exists to support the Board's findings. Substantial evidence (more than a scintilla and less than a preponderance) is relevant evidence that a reasonable mind would be willing to

17

accept as adequate in supporting a conclusion.[119]  "Under this standard of review, this Court is required to 'search the entire record to determine whether, on the basis of all the testimony and exhibits before the agency, it could fairly and reasonably reach the conclusion it did.'"[120]  Thus, in the absence of an error of law and where substantial evidence supports the Board's findings, its decision must be affirmed.[121]

It is solely within the Board's purview to weigh the evidence, assess the credibility of witnesses, resolve conflicts in the evidence, and make factual findings.[122]  The Board resolves conflicts in medical testimony as the finder of fact and the reviewing court takes "due account" of the Board's expertise.[123]  Thus, the Board is free to accept one expert's testimony over another's.[124]  Where the Board does so, "the opinion adopted by the Board constitutes substantial evidence for purposes of appellate review."[125]  The court construes the record "in the light most favorable to the party prevailing below, resolving all doubts in its favor."[126]

---

[119] *Powell v. OTAC, Inc.*, 223 A.3d 864, 871 (Del. 2019); *Munyan v. Daimler Chrysler Corp.*, 909 A.2d 133, 136 (Del. 2006).

[120] *Wilson v. New Castle Cty.,* 1997 WL 1048172, at *2 (Del. Super. Oct. 28, 1997) (citation omitted); *Dudlek v. Jovie Childcare Reimagined*, 2024 WL 4380153, at *3 (Del. Super. Oct. 3, 2024).

[121] *Zayas v. State*, 273 A.3d 776, 785 (Del. 2022) (citing *Olney v. Cooch*, 425 A.2d 610 (Del. 1981)); *Munyan*, 909 A.2d at 136.

[122] *Zayas*, 273 A.3d at 785 (citing *Powell*, 223 A.3d at 870).

[123] *Id.* (citing *Spellman v. Christiana Care Health Servs.*, 74 A.3d 619 (Del. 2013)).

[124] *Id.*

[125] *Munyan*, 909 A.2d at 136 (citing *Reese v. Home Budget Center*, 619 A.2d 907, 910 (Del. 1992)).

[126] *Dudlek*, 2024 WL 4380153, at *3 (citation omitted).

While legal issues are reviewed *de novo,*[127] the court affords significant deference to the Board's fact and credibility determinations.[128] Absent errors of law, the Board's decision is reviewed for abuse of discretion.[129] Abuse of discretion occurs when a tribunal has "exceeded the bounds of reason in view of the circumstances and has ignored recognized rules of law or practice so as to produce injustice."[130]

## V.    *Discussion*

### A.    *The Board did not commit legal error in applying the Duvall Standard.*

#### 1.    *Standards for determining a compensable injury.*

Under Delaware's Workers Compensation Act (the "Act"),[131] with exceptions that do not apply here, "every employer and employee" is bound to "pay and to accept compensation for personal injury or death by accident arising out of and in the course of employment, regardless of the question of negligence."[132] "Accident" is not defined in the statute, but it is given its ordinary meaning: "'An event that

---

[127] *Zayas*, 273 A.3d at 785 (citing *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892 (Del. 1994)); *Cline v. Nemours Found.*, 2023 WL 6622211 at *10 (Del. Super. Oct. 11, 2023).

[128] *Christiana Care Health Servs. v. Davis*, 127 A.3d 391, 395 (Del. 2015) (citing *Histed v. E.I. Du Pont de Nemours & Co.*, 621 A.2d 340 (Del. 1993)); *Powell*, 223 A.3d at 872. *See also* 29 *Del. C.* § 10142.

[129] *Glanden v. Land Prep, Inc.,* 918 A.2d 1098, 1100 (Del. 2007).

[130] *Harper v. State*, 970 A.2d 199, 201 (Del. 2009).

[131] 19 *Del. C.* § 2301 *et. seq.*

[132] 19 *Del. C.* § 2304.

takes place without one's foresight or expectation; an undesigned, sudden, and unexpected event.'"[133]

"A preexisting disease or infirmity, whether overt or latent, does not disqualify a claim for workers' compensation if the employment aggravated, accelerated, or in combination with the infirmary produced the disability."[134] The "employer takes the employee as he finds him."[135] As the Delaware Supreme Court set out in *Reese*,[136] applying a "but for" standard to preexisting conditions, an injury from an accident is compensable even if not "the sole cause or even a substantial cause of the injury," as long as the accident "provides the 'setting' or 'trigger,' causation is satisfied."[137] When there is a specific identifiable accident, there is no need to quantify causation, and the "but for" test applies, determining whether it was "a" cause.[138]

However, where there is no "specific link between regular job-related duties and the aggravation of preexisting aliments," under the "usual exertion" rule, a claimant must show that the "ordinary stress and strain of employment" was a "substantial cause" of the injury, as the Delaware Supreme Court expressed in *Duvall*.[139] "Substantial cause" is "limited to claims arising out of the ordinary stress

---

[133] *Duvall v. Charles Connell Roofing*, 564 A.2d 1132, 1134 (Del. 1989) (quoting *Webster's New International Dictionary*).
[134] *Reese v. Home Budget Ctr.*, 619 A.2d 907, 910 (Del. 1992).
[135] *Id.*
[136] *Id.*
[137] *Id.*
[138] *Id.* at 11.
[139] *Duvall*, 564 A.2d at 1133.

and strain of employment, [but] has no application to causation relating to specific and identifiable industrial accidents."[140]  The substantial cause standard is used in Delaware only in the absence of an identifiable industrial accident "'because of the difficulty of identifying a specific link between regular job related duties and the aggravation of preexisting ailments.'"[141]

Thus, the determination of whether *Duvall* or *Reese* applies hinges on whether there was an identifiable industrial accident.

### 2. *The record supports that there was no identifiable industrial accident.*

Johnson argues that there was an identifiable event—the annual teacher evaluation.  Because this triggered her anxiety, according to Johnson, the Board should have applied the "but for" test to determine whether stress was "a cause." Employer responds that the annual review is not an "accident" as this was a part of

---

[140] *Reese*, 619 A.2d at 911; *State v. Steen*, 719 A.2d 930, 932 (Del. 1998) ("In cases where a claimant is injured by the aggravation of a pre-existing condition *and* there is no identifiable industrial accident, however, causation is governed by the usual exertion rule.") (emphasis in original).

[141] *Steen*, 719 A.2d at 933 (quoting *Reese*, 619 A.2d at 911).

Johnson's normal employment activities and, therefore, the Board properly applied the "substantial cause" standard.

As the cases below illustrate, an identifiable accident must be "specific and identifiable,"[142] "physical,"[143] and "unexpected."[144] "[T]he claimant must demonstrate that a work-accident occurred, establishing one with a definite referral to time, place and circumstance."[145]

In *State v. Steen*, the Delaware Supreme Court affirmed the lower court's finding that "Steen did not experience an identifiable physical accident" when he suffered a burst brain aneurism while responding to the scene of a car accident as the deputy chief of a volunteer fire company.[146] Mr. Steen was not assisting on the scene in some physical way, but suffered the injury while he was "giving instructions to fire department personnel."[147]

In *Tibbits v. United Parcel Service,*[148] a delivery driver was driving along his route "when he experienced lower back pain 'out of nowhere' around 10:15 or 10:20

---

[142] *Reese*, 619 A.2d at 911.

[143] *Steen*, 719 A.2d at 933 ("Steen's aneurysm was pre-existing and … Steen did not experience an identifiable physical accident."); *see also Tibbits v. United Parcel Serv.*, 2013 WL 1400864, at *4 (Del. Super. Mar. 28, 2013), *aff'd in part* and remanded sub nom. *United Parcel Serv. v. Ryan Tibbits*, 93 A.3d 655 (Del. 2014) ("Under this rule an injured claimant can recover workers' compensation benefits when there is no specific identifiable physical industrial accident.").

[144] *Duvall*, 564 A.2d at 1134.

[145] *Powell*, 223 A.3d at 871 (quoting *Hardy v. E. Quality Vending*, 2015 WL 2378903, at *6 (Del. Super. May 12, 2015)) (internal quotation marks omitted).

[146] *Steen*, 719 A.2d at 933.

[147] *Id.* at 931.

[148] 2013 WL 1400864 (Del. Super. Mar. 28, 2013).

a.m."[149] "Because a specific and identifiable work activity could not be pinpointed," the Superior Court upheld the board's decision that no industrial accident occurred and continued its analysis under the "usual exertion rule," which applies the substantial cause test. [150]

Here, Johnson presented no facts that would constitute an "accident." As noted, the Board accepted her factual version of events. The record reflects that she began experiencing back spasms and pain the night of January 5 and had symptoms of headache, nausea, and her leg feeling "funny" the next morning. While at the school, she suffered a catastrophic event, but there was no work related specific and identifiable, physical, and unexpected event. Indeed, Johnson did not pinpoint a specific moment in time when she suffered an accident. Her version of events did not include any physical activity and the evaluation was not unexpected. As in *Steen* and *Tibbits*, Johnson failed to establish an "accident."

Johnson relies on *Page v. Hercules, Inc.*[151] to argue this that conclusion is wrong because, in her view, *Page* requires the court to focus "in an <u>unintended cause or result</u>, rather than a specific incident or unusual event'" to determine whether an accident occurred.[152] Johnson, however, misconstrues *Page*. The claimant in *Page*

---

[149] *Id.* at *1.
[150] *Id.* at *3-4.
[151] *Page v. Hercules, Inc.*, 637 A.2d 29 (Del. 1994).
[152] Johnson Reply Brief, at 3 (D.I. 24) (emphasis in original).

sought benefits due to an injury arising from the "the ordinary stress and strain of her job duties" and applied the "substantial cause" test.[153] The *Page* court, citing *Duvall*, noted that the "by accident" language in Section 2304 of the Act, "focuses on the unintended cause or result, rather than a specific incident or unusual event."[154] In this context, the *Duvall* court, noting that "accident" is not defined in the Act, adopted a plain and ordinary meaning: "'[a]n event that takes place without one's foresight or expectation; an undesigned, sudden, and unexpected event.'"[155] *Duvall* and *Page* were interpreting "by accident" in the implementing provision of the Act for work related injuries, which of course, does not require a physical accident.[156] Unlike here, the courts were not analyzing whether an identifiable accident had occurred to determine whether the "but for" or "substantial cause" standard applied.[157]

Johnson also relies on language in *Reese* that "[i]f the accident provides the 'setting' or 'trigger,' causation is satisfied for purposes of compensability."[158] She

---

[153] *Page*, 637 A.2d at 33.
[154] *Id.*
[155] *Duvall*, 564 A.2d at 1134.
[156] *See Boulden v. Delmarva Power and Light Co.,* 1994 WL 682867, at *3 (Del. Super. Oct. 31, 1994) ("When the usual work habits and duties are a substantial cause of the claimant's disability, the claimant may recover.").
[157] *See also Giofre v. G.C. Cap. Grp.*, 1995 WL 264585, at *4 (Del. Super. Apr. 17, 1995), *aff'd sub nom. G & C Cap. v. Giofre*, 670 A.2d 1338 (Del. 1995) (finding the *de minimis* body movement of the employee turning his head in response to a work-related question and the resulting neck injury satisfied the "accident" requirement in Section 2304).
[158] *Reese*, 619 A.2d at 910 (emphasis added).

argues that the evaluation and the resulting stress were the "triggers" for her stroke and thus, there was an identifiable event.[159]  Johnson's argument, however, misapplies *Reese*.  There, the claimant suffered a back injury while delivering a mattress in the course of his employment, which the court found to be a "specific and identifiable industrial accident."[160]  That accident triggered the claimant's mental health injury, which the court found to be compensable.[161]  Thus, the "trigger" related to the injury resulting from the industrial accident, not the determination of whether an industrial accident had occurred.

With substantial evidence in the record that Johnson did not suffer an identifiable industrial accident, the Board correctly applied the *Duvall* standard to Johnson's petition.

**B.**    ***The Board's reliance on Dr. Townsend's testimony is supported by substantial evidence.***

The Board accepted the testimony of Dr. Townsend over that of Dr. Dogali. Johnson argues that the Board's determination is not supported by substantial evidence because of the Board's finding that heightened stress is a contributing factor to a cerebral stroke and there was no evidence that "a vascular cerebral stroke was different from a vascular spinal stroke" or would have different causes.[162]  While

---

[159] OB, at 26.
[160] *Reese*, 619 A.2d at 911.
[161] *Id.* at 910.
[162] OB, at 29.

Johnson acknowledges that Dr. Townsend testified spinal strokes are rare, she argues that he offered no evidence a spinal stroke was any different than a stroke occurring in a different part of the body.[163]

Employer counters that it is within the Board's purview to weigh credibility of the witnesses and there is substantial evidence supporting the Board's decision.[164]

Johnson does not challenge the Board's authority to accept one expert over another. She also does not take issue with the Board's finding that Dr. Dogali's opinions on stress and spinal strokes were not supported by the literature.[165] The crux of Johnson's argument is Dr. Townsend acknowledged that stress has some impact on cerebral strokes, but he did not rule out that stress can be a cause of a spinal stroke. But, Johnson, not Employer, bore the burden to prove her injury was compensable.[166] Thus, it was not Employer's obligation to disprove Johnson's unsupported stress theory. As the Board ruled, it would not make medical findings without supporting evidence, which is what Johnson's argument would require. On this ground alone, Johnson's argument fails.

Additionally, a review of the entire record below, and construing it in favor of Employer as the Court must, shows that the Decision is supported by substantial

---

[163] *Id.*
[164] Employer's Answering Brief (D.I. 20), at 17-18.
[165] *See* Decision, at 24.
[166] *Lewis v. Scotti Muffler*, 2001 WL 1752561, at *6 (Del. Super. Dec. 27, 2001); *Hoffecker v. Lexus of Wilmington*, 2012 WL 341714, at *3 (Del. 2012) (citing *Strawbridge & Clothier v. Campbell*, 492 A.2d 853, 854 (Del. 1985)).

evidence. First, Dr. Townsend had a more thorough understanding of Johnson's prior medical history, having reviewed records dating back almost 10 years before the incident.[167] Dr. Townsend testified to the serious and prolonged comorbidities from which Johnson suffered and the correlated high risks for a stroke.[168] Dr. Dogali did not take a family history or review past medical records, and assumed that Johnson's underlying medical conditions only recently became problematic.[169]

Second, the medical literature Dr. Townsend relied on related to spinal strokes, in contrast to Dr. Dogali, who relied solely on articles on cerebral strokes.[170] And, Dr. Townsend's testimony on Johnson's medical conditions increasing the risks of ischemic events was supported by the literature. Further, the articles Dr. Dogali relied on found stress was only a "moderate risk," increasing the risk by only 1.3x. This Court will not second guess the Board's credibility determination. Accordingly, the Board's findings are supported by substantial evidence, and there has been no abuse of discretion.

The Board's Decision is **AFFIRMED**.

**IT IS SO ORDERED**.

/s/Kathleen M. Miller
Kathleen M. Miller, Judge

---

[167] Townsend Tr., at 22-23, 69-70.
[168] *Id.*, at 22, 39, 45.
[169] Dogali Tr., at 38-40, 42-43, 49-50; Decision, at 11.
[170] Townsend Tr., at 12-13; *see also* Decision, at 24.